William W. FOX, Individually and as Trustee of Longmont Foot and Ankle Clinic, P.C. Pension Plan and of Longmont Foot and Ankle Clinic, P.C. Profit Sharing Plan, Petitioner,

v.

I–10, LTD., a Colorado limited partnership, Respondent.

No. 96SC483.

Supreme Court of Colorado, En Banc.

March 23, 1998.

Hutchinson Black and Cook, LLC, David M. Packard, C. Brad Peterson, Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, for Petitioner.

Davis & Ceriani, P.C., Gary J. Ceriani, Bruce E. Rohde, Denver, for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

William Fox, individually, and as trustee for a pension plan and a profit sharing plan, (Fox) is a limited partner in I–10 Ltd. (the Partnership or I–10). Fox appeals a judgment of the court of appeals holding that the amendment provisions in the partnership agreement and applicable statutes allowed the limited partners to increase their capital contribution obligation by majority vote. *Fox v. I–10 Ltd.,* 936 P.2d 580 (Colo.App. 1996). We granted certiorari to consider the propriety of this ruling,[1] and now conclude that the majority vote provision plainly allows amendment of the limited partners' cap-

---

1. Our order granting certiorari sets forth the following issue:

 Whether the court of appeals erred in concluding that limited partners in a Colorado limited partnership who contributed sums certain to the partnership as set forth in the partnership agreement and certificates can become obligated to contribute additional capital to the partnership without their consent following a majority vote of the partners.

ital contributions; and this provision is not contrary to statutory provisions requiring capital contributions to be set forth in a certificate of limited partnership.

### I.

In 1982, Fox purchased approximately 20% of the available limited partnership units in a Colorado limited partnership known as I–10 Ltd. Fox and several other limited partners (LPs) executed a limited partnership agreement with the general partner, MSP Investment Co., (MSP) dated November 1, 1982 (the Agreement). The purpose of the Partnership was to acquire, develop and hold for resale 305 acres of land in Pima County, Arizona.

Article 4.09 of the Agreement provided:

*Additional Assessments.* If at any time after the formation of the Partnership the General Partner determines that additional contributions to the capital of the Partnership are necessary or desirable for any purpose, the General Partner shall mail a notice to each Limited Partner specifying the aggregate amount of additional capital to be contributed to the Partnership, such Limited Partner's pro rata share of the additional capital required, the purpose for the assessment, the intended use of the proceeds thereof, and the penalty to be imposed for failure to meet the assessment.... The total additional capital contribution required to be made by each Limited Partner hereunder shall not exceed an amount equal to four hundred percent (400%) of the initial capital contribution to the Partnership of each Limited Partner.

Article 7.00 dealing with amendments set forth two methods of amending the agreement depending upon the nature of the proposed change. Article 7.01 allowed the general partner, in its sole discretion, and as attorney in fact for the limited partners, to make certain "routine amendments" without the need for any partnership vote. These types of amendments related mainly to administrative matters such as preservation of proper status for federal income tax purposes.

Article 7.02 encompassed all other, non-routine amendments, and provided that, except for amendments affecting MSP's rights, all other amendments to the agreement would be made by majority vote:

*Other Amendments.* All amendments, other than those set forth in paragraph 7.01 hereof, shall be proposed in writing by the General Partner or by Limited Partners owning not less than twenty-five percent (25%) of the Limited Partners' aggregate Interest in the Partnership for voting purposes. Any proposed amendment shall not become effective until it has been considered at a meeting of the Limited Partners duly held for that purpose and has received the affirmative vote of a majority of the Limited Partners' aggregate Interest in the Partnership and the approval of the General Partner. Notwithstanding the foregoing provisions of this paragraph to the contrary, no amendment shall be made to this Agreement which would deprive the General Partner of its Interest in the Partnership, or of any compensation or reimbursement of expenses due to the General Partner as provided herein.

In May of 1983, the Partnership filed a certificate of limited partnership in accordance with then-existing requirements under The Colorado Uniform Limited Partnership Act (CULPA). *See* § 7–62–201, 3 C.R.S. (1973) (repealed 1986). This previous version of the statute required a limited partnership to specify in the certificate the amount each partner had contributed and had agreed to contribute in the future. *See* § 7–62–201(e), 3 C.R.S. (1973)(repealed 1986)(hereafter Section 201(e)). In addition, the certificate was to include a description of the "times at which or events on the happening of which any additional contributions agreed to made by each partner are to be made." § 7–62–201(f), 3 C.R.S. (1973)(repealed 1986)(hereafter Section 201(f)). CULPA was amended in 1986, and these items are no longer required in the certificate.

In accordance with these statutory provisions, the original certificate reflected that Fox had contributed a total of $85,000 to the Partnership and had agreed to potential future assessments not exceeding $340,000

(400% of $85,000). The certificate also stated that article 4.09 of the Agreement governed the times at which, or events upon the happening of which, the partners had agreed to make additional contributions. The Partnership attached a copy of article 4.09 as an exhibit to the certificate.

Over the next few years, the Partnership found it necessary for various reasons to amend the Agreement several times. In February 1986, MSP sent a letter and a proxy to the limited partners proposing certain amendments to the Agreement. Efforts to sell the property had failed, and MSP sought amendments that would, among other things, change the purpose of the Partnership to include a possible land exchange with the State of Arizona, and amend article 4.09 to increase potential assessments from 400% to 600% of the original investment.

In its letter, MSP focused on the proposed change in purpose and noted that such a change could only be accomplished if each partner agreed. This was true because article 2.04 of the Agreement required 100% of all outstanding interests in the Partnership to consent to any action of the general partner that was inconsistent with the existing "principal business and purpose of the Partnership." Because the Agreement did not contemplate a land exchange, MSP recognized that it had to obtain consent of all the partners to make this change.

In the proxy accompanying the letter, MSP set out all the proposed amendments to the Agreement, including, among others, the capital contribution increase, and specified that amendment would be accomplished by majority vote as required in article 7.02 of the Agreement.[2]

At a meeting in March of 1986, MSP and all of the limited partners, including Fox, voted to amend paragraph 4.09 and increase the contribution cap to 600%. The Partnership filed an amended certificate reflecting the new cap and adjusting the total potential

contributions accordingly. As with the original certificate, the amended certificate also stated that article 4.09 governed the times and events that could trigger obligations under the new cap.

The Partnership thereafter was unable to secure a suitable exchange or sale of its land, and by 1993 needed additional cash to finish paying its mortgage. MSP again proposed to amend article 4.09 of the Agreement by increasing the contribution cap to 800%. At a meeting in December of 1993, a majority of the partners (all partners except Fox) voted to amend article 4.09 and increase the cap to 800%. Fox voted against the amendment. Shortly after the majority vote, MSP sent Fox a notice of additional assessment for amounts in excess of the previous 600% cap. Fox paid the assessment up to 600% of his initial contribution, but refused to make further contributions. Fox then filed an action in the district court seeking a declaratory judgment that he had no obligation beyond the 600% cap, and seeking an injunction preventing the Partnership from declaring him in default under the terms of the Agreement.

The district court granted summary judgment for Fox and entered an order declaring that the Agreement did not permit an increase in the limited partners' capital contribution by majority vote. The district court also found that even if the Agreement were to permit such an amendment, it would be contrary to the provisions of CULPA. The court of appeals reversed, holding that the language of the Agreement did, in fact, allow this amendment by majority vote, and that the statutes did not prohibit it. We agree.

## II.

■ We begin our analysis with a review of well-settled principles of contract law. Our courts have repeatedly recognized the sanctity of contracts and the court's role in

---

**2.** I–10 contends that the 1986 amendment proceedings provide evidence of the parties' intent that article 4.09 could be amended by the procedures in article 7.02. Fox points out that the letter refers to unanimous consent and the proxy indicates that majority vote, even for the change in purpose, is appropriate. Accordingly, Fox ar-

gues, the parties' intentions are unclear and the court can glean no reliable evidence of intent from the 1986 amendment proceedings. We need not resolve this issue. Because, as discussed herein, we conclude that the Agreement is clear and unambiguous, we do not resort to extrinsic evidence of the parties' intent.

enforcing them. Quoting the United States Supreme Court, we have held that:

> the right of private contract is no small part of the liberty of the citizen, and ... the usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation....

*Francam Bldg. Corp. v. Fail,* 646 P.2d 345, 349 (Colo.1982)(quoting *Baltimore & Ohio Southwestern Ry. v. Voigt,* 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560 (1900)). Where a party enters into a contract absent fraud, duress or incapacity, the courts will not relieve that party of the consequences of the bargain simply because it may have been improvident. *See Ace Flying Serv., Inc. v. Colorado Dep't of Agriculture,* 141 Colo. 467, 472, 348 P.2d 962, 965 (1960); *Sedalia Land Co. v. Robinson Brick & Tile Co.,* 28 Colo. App. 550, 553, 475 P.2d 351, 354 (1970).

The court's duty is to interpret and enforce contracts as written between the parties, not to rewrite or restructure them. *See Yamin v. Levine,* 120 Colo. 35, 38, 206 P.2d 596, 597 (1949) ("If the contract clearly expresses the intentions of the parties, it must be construed as written...."); *Gertner v. Limon Nat'l Bank,* 82 Colo. 13, 41, 257 P. 247, 257 (1927) (stating that "[c]ourts do not make contracts for parties" and "do not open their doors to those that are suffering merely from their own bad bargains"). The court will not interfere with the valid bargain of the parties:

> The impossibility of courts attempting to act as business clearing houses for the readjustment of legitimate profits and losses occurring in the marts of trade and commerce is obvious at a glance. To attempt it ... would be an unwarranted interference with the freedom of action of business men in their private affairs.

*Nelson v. Van Schaack & Co.,* 87 Colo. 199, 203, 286 P. 865, 867 (1930).

Parties to a contract, therefore, may agree on whatever terms they see fit so long as such terms do not violate statutory prohibitions or public policy. *See e.g., USI Properties East, Inc. v. Simpson,* 938 P.2d 168, 173 (Colo.1997); *Aetna Cas. & Sur. Co. v. McMichael,* 906 P.2d 92, 100 (Colo.1995);

*Westminster Properties, Inc. v. Atlanta Assocs.,* 250 Ga. 841, 301 S.E.2d 636, 638 (1983) ("Partners generally, be they general or limited, may make any agreement between themselves that they deem desirable so long as said agreement is not in violation of prohibitory statutory provisions, the common law, or relevant considerations of public policy."). Additionally, where a contract is clear and unambiguous, courts must give effect to the plain and ordinary meaning of its terms. *See Wota v. Blue Cross & Blue Shield,* 831 P.2d 1307, 1309 (Colo.1992).

### III.

Hence, we look first to the terms of the Agreement itself to determine whether Fox can be required, by majority vote, to increase his capital contribution. Fox asserts that there is tension between article 4.09, placing a definitive cap on contributions, and article 7.02, allowing amendment of the Agreement by majority vote, thereby creating an ambiguity with respect to the parties' intent. We do not agree.

Article 7.02 plainly states that *"[a]ll amendments, other than those [routine amendments] set forth in paragraph 7.01"* may be accomplished by majority vote. Article 7.02 goes on to specify that certain items are excluded from amendment by the majority vote procedure set out therein. Increase in capital contributions is not among the exclusions of article 7.02. Furthermore, article 2.04 specifically requires unanimous consent of the limited partners prior to allowing the general partner to take certain actions. Hence the parties clearly excluded certain items from amendment by majority vote, but did not exclude a change in capital contributions from this method of amendment. Neither the language in article 4.09, nor any other language in the Agreement, creates doubt about whether article 7.02 provides the proper procedure for amending article 4.09.

Fox argues that the ceiling on a limited partner's capital contribution is such a fundamental aspect of a limited partnership that, as a matter of law, it may not be amended by majority vote regardless of what the Agreement might state. In other words,

an LP's liability is "limited" by virtue of the very nature of limited partnerships and this fundamental precept cannot be altered without consent of the limited partner. We agree that the limit on an LP's liability represents a defining characteristic of a limited partnership interest. An LP's liability is limited by operation of law with respect to creditors of the partnership. *See* § 7–62–303, 2 C.R.S. (1997); *Black v. First Fed. Sav. & Loan Ass'n*, 830 P.2d 1103, 1110 (Colo.App.1992); *Klein v. Weiss*, 284 Md. 36, 395 A.2d 126, 136 (1978) (citing the Uniform Limited Partnership Act that a limited partner's "liability . . . is to the partnership, and not to its creditors"); 2 Zolman Cavitch, *Business Organizations* § 39.07 (1996)(noting that the "single most important characteristic that distinguishes a limited partnership from a general partnership" is that LPs are not personally liable for partnership debts and obligations). An LP's liability to the partnership is also limited, but this limitation is defined, not by operation of law, but by the partnership agreement as the amount of capital which an LP agrees to contribute. *See* Cavitch, § 39.07[2] (stating that while LPs are not liable to partnership creditors, they are liable to the partnership for their agreed upon capital contributions). While LPs may not, for example, agree among themselves to treat each other internally as general partners and still preserve their limited liability status with respect to creditors, there is no fundamental tenet of limited partnership law that prevents LPs from voluntarily agreeing, by majority vote or otherwise, to increase their capital contribution to the partnership.

The Washington Court of Appeals faced a remarkably similar situation in *Diamond Parking Inc. v. Frontier Bldg. Ltd. Partnership*, 72 Wash.App. 314, 864 P.2d 954 (1993). In that case the partnership agreement allowed for amendment by a 70% vote. *See id.* at 957. The holders of seventy-four percent of the partnership interests voted to restructure the partnership so as to increase the interests of those LPs who contributed additional capital. *See id.* The court enforced this amendment provision in the agreement noting that the "partnership agreement is the law of the partnership." *See id.* We find the Washington court's words particular-

ly apposite to the instant case that a party "[h]aving elected to join the partnership with this type of majority voting provision . . . cannot now complain merely because the partnership adopted an amendment of which he did not approve." *Id.*

We thus conclude that the plain language of the Agreement allows a majority of the partners to vote to amend the capital contribution amount, and no "fundamental right" invalidates that contractual term. Rather, if any fundamental right is implicated, it is the fundamental right to enter into a contract and expect its terms to be enforced.

### IV.

We now turn to the provisions of CULPA and consider whether it imposes other obligations on the parties, or supersedes the Agreement.

### A.

█ CULPA requires limited partnerships to file a certificate of limited partnership with the secretary of state. Fox contends that the provisions in CULPA requiring identification of the limited partners' capital contributions on the certificate prohibit I–10, as a matter of law, from imposing additional capital contributions without Fox's consent. The prior version of CULPA required that the certificate of limited partnership specify in pertinent part:

> (e) The amount of cash and a description and statement of the agreed value of the other property or services contributed by each partner and which each partner has agreed to contribute in the future; [and]
>
> (f) The times at which or events on the happening of which any additional contributions agreed to be made by each partner are to be made;

§ 7–62–201, 3 C.R.S. (1973) (repealed 1986).

The 1986 amendments to CULPA eliminated these requirements in the certificate, and added a provision in another section that "[n]o promise by a limited partner to contribute to the limited partnership is enforceable unless set out in a writing signed by the limited partner." § 7–6–502(3), 2 C.R.S.

(1997). Fox asserts that this later provision was enacted to provide essentially the same protections as those in the old Sections 201(e)and (f). Accordingly, Fox maintains that amendment of capital contribution without consent of all affected partners violates both the old and new versions of CULPA.

The old statute required the filing of a certificate that identified the capital contributions of the partners and that was signed by the LP. The new statute provides that capital contributions are not enforceable unless set out in a writing signed by the LP. The thrust of Fox's argument is that both provisions are intended to protect LPs from any changes in their capital contributions to the partnership, and thus embody a statutory requirement that capital contributions cannot be changed without consent of the affected LP. We are not persuaded.

■ Certificates of limited partnership serve the goal of giving third parties, specifically potential creditors, notice concerning matters of importance to them in dealing with the partnership. *See Black,* 830 P.2d at 1111 (noting that "the certificate protects third persons who deal with the partnership"); *Klein,* 395 A.2d at 136 ("The principal function of the certificate is to give third persons notice of the essential features of the limited partnership."); 2 Zolman Cavitch, *Business Organizations* § 39.05[2] (1996)(asserting that "the purpose of filing [a certificate] is to acquaint third persons with the essential features of the partnership arrangement in order to protect their rights"). The certificate is not designed to protect or govern the rights of the partners as among themselves, and it cannot trump a valid contractual term. *See New York Stock Exch. Inc. v. Sloan,* 391 F.Supp. 530, 532 (S.D.N.Y.1975)(holding that problem with the certificate does not preclude formation of a partnership as between the parties; the filing requirement protects creditors and third parties, not the partners themselves); *Holvey v. Stewart,* 265 Or. 242, 509 P.2d 17, 18–19 (1973)(error in certificate does not affect rights as between the partners because certificate protects third parties); 59A Am. Jur.2d, *Partnerships* § 1278, (1987)(noting that certificates "are not intended for the

protection of partners, and failure to comply with them does not affect the rights of partners among themselves").

The recent legislative history surrounding elimination of the certificate requirements, both in the uniform law and in Colorado's version, supports the conclusion that the requirements were never intended to protect limited partners, much less hold sway over contractual obligations among the partners. The National Conference of Commissioners on Uniform State Laws adopted amendments to The Uniform Limited Partnership Act (ULPA) in 1985. Section 201 governs the requirements in the certificate. *See* Unif. Limited Partnership Act § 201, (amended 1985) 6A U.L.A. 95 (1995). The comment to section 201 of ULPA states that the elimination of many items in the certificate is:

> in recognition of the fact that the partnership agreement, not the certificate of limited partnership, has become the authoritative and comprehensive document for most limited partnerships, and that creditors and potential creditors of the partnership do and should refer to the partnership agreement and to other information furnished to them directly by the partnership and by others, not to the certificate of limited partnership, to obtain facts concerning the capital and finances of the partnership and other matters of concern.

Unif. Limited Partnership Act § 201, cmt. (amended 1985) 6A U.L.A. 96 (1995). The requirements in the certificate focus on what creditors need to know. The change clarifies that the partnership agreement controls the rights and obligations of the partners among themselves, and creditors, in the interest of obtaining accurate information, should refer to this document rather than the certificate. The previous comment to section 201 of ULPA stated that:

> the certificate is intended to serve two functions: first, to place creditors on notice of the facts concerning the capital and finances of the partnership and the rules regarding additional contributions to and withdrawals from the partnership; second, to clearly delineate the time at which persons become general partners and limited partners.

Unif. Limited Partnership Act § 201, cmt. (amended 1985) 6A U.L.A. 96 (1995). Again, the focus is on providing creditors with the information they need, i.e., capital structure and liability to outside parties.

In 1986, Colorado amended CULPA to conform to the 1985 amendments to ULPA. Colorado's legislative history is consistent with the comments to the changes in ULPA. In testimony before the Senate Judiciary Committee, a representative from the secretary of state's office discussed the elimination of certain items in the certificate. *See* Hearing on H.B. 1182 Before the Senate Judiciary Committee, 55th Gen. Assembly, 2d Sess., Mar. 12, 1986 (statements by Don Thompson, Division of Commercial Recording, Secretary of State). He explained that the requirements were being pared down as a matter of efficiency. The new requirements would alert the public as to the existence of a limited partnership. Any specific information would come from the partnership agreement itself. The process of filing a certificate thereby becomes much faster and the secretary of state's staff does not need to check certificates for a laundry list of unnecessary items. *See id.* A document submitted to the committee along with the proposed amendments states:

> Much of the information required by current law to be set forth in the certificate is being eliminated because it deals with information relative to the rights and duties between the partners and not affecting the partnership's duties to persons outside the partnership. Such information already is contained in the partnership agreement. Thus, the requirement of current law to set forth this information in the certificate adds no material benefit and may harm the parties by creating *traps for the unwary or creating inconsistencies or ambiguities.*

Hearing on H.B. 1182 Before the Senate Judiciary Committee, 55th Gen. Assembly, 2d Sess., Mar. 12, 1986 (Summary of Changes to Limited Partnership Stat-

utes)(emphasis added). The drafters apparently were troubled by the possibility of an inconsistency between the agreement and the certificate creating unnecessary confusion and contention. The case now before us represents just such a circumstance.

It is clear from the precedent, treatises and legislative history that the law does not intend the certificate of limited partnership to control the rights and obligations of partners among themselves. The requirements of Sections 201(e) and (f) do not create a statutory mandate prohibiting limited partners from contractually agreeing to allow an increase in capital contributions by majority vote.

### B.

 Fox also argues that the certificates filed by I–10 did not meet the requirements for stating the LPs' capital contribution obligations under the previous version of the statute.[3] Section 201(f) requires the certificate to specify the events that can trigger additional capital contributions. Fox asserts that if majority vote of the partners constituted such an event, the statute mandated that it be so identified on the certificate. I–10's original and amended certificates state that article 4.09 governed the times or events upon which partners had agreed to make future contributions. Hence, Fox argues that majority vote cannot be an event triggering capital contributions because the certificate and amended certificates do not so state.

 First, we do not believe that the statutory language requires identification of the process by which partners may amend their agreement. Second, even if this were the case, such an error in the certificate would not relieve the partners of their contractual obligations to one another. Section 201(f) requires the certificate to include those events *already contractually agreed to* by the parties as triggering additional capital

---

**3.** The court of appeals applied the previous version of the statute because the parties assumed in their briefs to that court that the previous version of the statute applied. In this court, the parties have indirectly raised this issue. We apply the stricter certificate requirements in order to give

Fox the benefit of the most protective provisions since section 7–62–1102, 2 C.R.S. (1997) prevents application of the 1986 amendments in such a manner as to impair any contract or affect any right accrued prior to July 1, 1986. *See* § 7–62–1102, 2 C.R.S. (1997).

**1026**

obligations. Third parties want to know what contribution they can rely upon from each partner. Here, article 4.09, attached to the certificate, accurately reflects that partners could be required, at the discretion of MSP, to contribute up to 400% (and later 600%) of their initial contributions.

■ The pre–1986 version of section 7–62–202, dealing with amendments to the certificate, also sheds light on the intended application of Section 201(f). In interpreting statutes, courts must read and consider the statute as a whole and give consistent, harmonious and sensible effect to all of its provisions. *See Rodriguez v. Schutt*, 914 P.2d 921, 925 (Colo.1996).

Section 7–62–202(2)(a) required amendments to reflect "a change in the amount or character of the contribution of any partner or *in any partner's obligation to make a contribution*." § 7–62–202(2)(a), 3 C.R.S. (1973)(repealed 1986)(emphasis added). If the General Assembly had intended Section 201(f) to include more than just the current agreement with respect to what additional contributions could be required, there would have been no need for section 7–62–202(2)(a) to refer to a change in any partner's *obligation* to contribute. The first part of Section 202(2)(a) refers to "a change in the amount" of the capital contribution. This covers the situation in which a triggering event or time has occurred and partners have actually been called upon to increase their contributions. The second part of Section 202(2)(a) contemplates the possibility that a partner's obligation to contribute, rather than just the amount of the contribution, might change. This would refer to a change in the times or triggering events for additional capital contributions.

If Section 201(f) required a partnership to specify any and all potential changes in a partner's obligation to contribute, such as by majority vote amendment, then section 202(2)(a) would only need to record a change in the amount resulting from such vote. The language contemplating a change in the partner's obligation to contribute would be superfluous.

We conclude that Section 201(f) required the partners to record those contributions the parties had already agreed to, i.e., 400% of the initial contribution, and Section 202(2)(a) required the partners to record any change in the obligation accomplished by amendment, i.e., 600%, and then 800% of the initial contribution.

Finally, as the cases and authorities discussed in section IV.A. above make clear, even if we were to conclude that I–10's certificates contained an error of this type, such an error would not supersede the partners' contractual obligations. Fox is not a creditor of I–10 seeking to prove that he was harmed by an error in the certificate, but rather a party to a contract seeking to elevate the certificate over contractual obligations.

### V.

The Agreement, by its plain language, allows the parties to amend article 4.09 by majority vote. Neither a "fundamental right" of limited partnership nor CULPA precludes parties from agreeing to such an amendment procedure. Additionally, I–10 did not violate the certificate requirements of Sections 201(e) and (f), and in any event, the partners' rights and obligations *inter se* are governed by the partnership agreement, not by the certificate. Accordingly, we hereby affirm the court of appeals' decision reversing the district court's judgment, and remand for further proceedings consistent with the views expressed in this opinion.