266 F.2d 472
 STERLING COLORADO AGENCY, INC., a Colorado corporation, Appellant,
v.
STERLING INSURANCE COMPANY, an Illinois corporation, Appellee.
STERLING INSURANCE COMPANY, an Illinois corporation, Cross-Appellant,
v.
STERLING COLORADO AGENCY, INC., a Colorado corporation, Cross-Appellee.
 No. 5862.
 No. 5863.
 United States Court of Appeals Tenth Circuit.
 April 25, 1959.
 
 Frank A. Bruno, Denver, Colo. (H. D. Reed and Anthony Zarlengo, Denver, Colo., were with him on the brief), for appellant and cross-appellee.
 Robert Swanson, Denver, Colo. (Fred E. Neef and Rendle Myer, Denver, Colo., were with him on the brief), for appellee and cross-appellant.
 Before BRATTON, Chief Judge, and PICKETT and LEWIS, Circuit Judges.
 LEWIS, Circuit Judge.
 
 
 1
 Predicated upon diversity citizenship and the requisite jurisdictional amount this action involves a contractual dispute between an insurance underwriter[1], and one of its general agents.[2] The trial court awarded the Agency judgment in the amount of $24,188.41 for earned commissions and reimbursable expenses and the further sum of $1,607.24 as commissions upon certain policies of insurance accepted by the Company but later rescinded with direct refund of premiums to the policyholders. This appeal and cross appeal question the trial court's interpretation of the parties' contractual rights and duties in several particulars and also necessitate the determination of the more general question of whether or not an insurance agent can recover damages for the loss of renewal commissions due to the bad faith of an insurance company in its relation with policyholders. We consider first the more general question.
 
 
 2
 During the period of amicable relations between Company and Agency the latter sold and the former accepted many policies of health, accident and hospitalization insurance which contained guaranteed renewal provisions protecting the policyholders from at-will cancellation by the Company. The Agency was entitled to specified commissions upon renewal premiums. These particular policies soon proved to be unprofitable to the Company and, in an attempt to rid itself of the undesirable business, the Company refused to pay many valid claims and induced its policy holders to execute riders limiting the Company's liability to such an extent that many policies which would have been renewed were not. The trial court specifically found that the Company's actions in this regard constituted bad faith to its policyholders but also specifically found that the Company's actions, being not limited to policies written by the Agency or within its territorial limits, were not motivated by ill will toward the Agency. The court concluded that there was no bad faith violation of the Company-Agency contract.
 
 
 3
 It is true that an insurer cannot by arbitrary action cancel a policy to prevent collection of renewal premiums by the Agent, Ensign v. United Pacific Ins. Co., 107 Utah 557, 155 P.2d 965; Newcomb v. Imperial Life Ins. Co., C.C. Mo., 51 F. 725; or to force the agent to accede to improper demands, O'Brien Inc. v. Vehicle Underwriting Agency Corporation, 12 N.J.Misc. 815, 175 A. 256, or otherwise interfere in business which it has promised the agent in order to defeat his rights. Such activities have been found to be violative of the implied covenant of good faith between the principal and agent. But we have been referred to no case, nor can we find one, where an agent has been allowed recovery for loss occasioned by bad faith between underwriter and policyholder. Absent a specific contract provision, the agent has no voice in the settlement of policy claims. He is not a third party beneficiary under the policy nor in direct privity through the insuring contract. He must recover on his own contract, if at all, and the implied promise of good faith dealing on that contract does not preclude the insurer from contracting with third parties according to its judgment of business interests. The Company having done just that, albeit in bad faith to its policyholders, is answerable only to the policyholders. The trial court was correct in so holding.
 
 
 4
 Appellant's other contentions require a particularization of the factual background of the parties' relationship. In the latter part of 1949, the Company and the Agency entered into a written contract which provided that the latter should represent the former in the State of Colorado in the sale of policies. The compensation to the Agency was to be certain specified first-year commissions and renewal commissions set forth in a schedule attached to the contract. The contract did not provide any period of duration or date of termination. The parties entered into another writing which provided for additional compensation to the Agency on life insurance written pursuant to the basic contract. The writing described the additional compensation provided for therein as "an expense allowance." The two written instruments bore the same date but the evidence indicates that they may have been executed on different dates, the basic contract first and the other one later.
 
 
 5
 In June, 1950, the territorial limits of the basic contract and the authority of the Agency to operate thereunder were extended to include the State of Wyoming. In September, 1950, the territorial limits encompassed by the basic contract were extended further to include certain counties in the States of Idaho and Montana. And in December, 1950, the territorial limits of the Agency were further extended to include the entire State of Montana.
 
 
 6
 The original instrument setting up the expense allowance provided that such allowance should be paid for the period commencing June 1, 1949, and ending May 31, 1950. By letter from the Company to the Agency dated May 12, 1950, the expense allowance agreement was extended to May 31, 1951. And by like letter dated June 1, 1951, such expense allowance agreement was extended for a period of five years, beginning June 1, 1951, and ending May 31, 1956. The duration of the basic contract was never expressly extended, and its termination was never expressly fixed by mutual action of the parties. In May, 1953, the Company revoked the authority of the Agency to represent it in Wyoming, Idaho and Montana; and in October, 1953, the Company terminated the authority of the Agency to represent it in Colorado. Its business having been terminated in that manner, the Agency ceased to operate soon thereafter.
 
 
 7
 The complaint was in two causes of action. In the first cause of action, the Agency sought to recover damages for breach of contract. The measure of damages pleaded was based upon the loss of commissions and expense allowance which had been earned or would have been earned in the future if the Company had not breached the contract. And the second cause of action — pleaded in the alternative — was for reimbursement of expenditures which the Agency made in reliance upon the contract, plus the reasonable value of its services rendered thereunder. By supplemental complaint the Agency sought to recover damages for the withholding of commissions and for deductions made from moneys due the Agency as a service charge.
 
 
 8
 As we have stated, the court entered judgment in favor of the Agency for the sum of $24,188.41, representing commissions and expense allowance accrued to the Agency's account as of June 30, 1957, together with interest thereon from the date such renewal commissions and expense allowance were received by the Company; also judgment in favor of the Agency for $1,607.24, or a total of $25,795.65, together with interest thereon. By the judgment, the Company was required to pay to the Agency forthwith such amounts of renewal commissions and expense allowance as had accrued to the Agency's account upon the books of the Company from June 30, 1957, to the date of the judgment, together with interest thereon; and the Company was further required to pay to the Agency as they should thereafter be received and accrued to the Agency's account renewal commissions and expense allowance due the Agency up to and including October 1, 1963, subject to termination prior thereto in the event that the renewal premiums should total less than $500 per month for any three consecutive months, computed in accordance with the contract and the schedule of commissions incorporated in the contract. The Agency appealed from specified features of the judgment; and the Company perfected a general cross appeal from it.
 
 
 9
 The correctness of the judgment below is first dependent upon the trial court's ruling that the two contracts, both bearing date of December 1, 1949, should nevertheless be interpreted separately, leaving the basic agency contract as one terminable at will by the Company.
 
 
 10
 Although the basic agency contract and the expense allowance contract carry the same execution date, the effective date of the second contract was six months prior to the formation of the agency. The agency contract provided consideration for its performance, and the mere fact that the expense allowance permitted additional compensation for certain types of business or that both contracts were executed on the same date is not conclusive of the intent of the parties. Appellant relies upon the language of such cases as Peerless Casualty Co. v. Housing Authority, 5 Cir., 228 F. 2d 376, 381, indicating that "where two instruments are executed at the same time, between the same parties, relative to the same subject-matter, they are to be taken in connection as forming together the several parts of one agreement." This rule has been generally adopted, sometimes by statute, as an aid to the courts in their paramount quest for the intent of the parties to a contract, and in conjunction with the rule that the contract must be construed as a whole. But the determination of whether two instruments constitute but one transaction to permit such construction must depend upon the particular obligations undertaken and the facts surrounding the promises. Clark v. Levy, 25 Ariz. 541, 220 P. 232. To do otherwise would do violence to the intention of the contracting parties. The purpose and effect of the rule was analyzed in Huyler's v. Ritz-Carlton Restaurant & Hotel Co., D.C.Del., 1 F.2d 491, 492:
 
 
 11
 "It is true that the principle by which instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are considered as one, and receive the same construction as if embodied in one instrument, is of wide application and the illustrative cases are many * * But at most that principle is merely a rule of construction to give effect to the intent of the parties. The provisions of one instrument are not thereby imported bodily into another. The application of the rule does not result in actual consolidation of the several contracts. It does not convert a specialty into a simple contract, or a simple contract into a specialty. Each of several instruments may be construed in the light of the others, without their being considered as one for all purposes. Moreover, considering several instruments as one is not the natural construction, and is resorted to only to effectuate the intention. They may be intended to be separate instruments and to provide for different things. Barker v. Sartori, 66 Wash. 260, 264, 119 P. 611; Thorp v. Mindeman, 123 Wis. 149, 101 N. W. 417, 68 L.R.A. 146, 107 Am.St. Rep. 1003, 6 R.C.L. 852 * * *"
 
 
 12
 To the same general effect see 17 C.J.S. Contracts § 298 and 12 Am.Jur., Contracts, sec. 246; Commissioner of Internal Revenue v. Le Gierse, 2 Cir., 110 F.2d 734, reversed on other grounds 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996.
 
 
 13
 In the case before us, the sole question involving the intent of the parties at the time of entering the contract and at the time extensions to the expense allowance were granted is whether they contemplated a termination date for the agency relationship. Clearly, the parties no more intended the termination date of the bonus agreement to control their basic contract than they intended its back-dated effective date to create a general agency prior to the time the parties agreed on terms. The expense allowance was subject to change for economic reasons without agreement; the basic contract was written to cover the rights and duties of the parties in a continuing relationship.
 
 
 14
 Evidence which the Agency claimed demonstrated the intent of the parties to embody their agreement in two documents is not inconsistent with the trial court's finding that the documents were negotiated and executed as independent agreements; both documents bore the same dates; the contents of both documents were discussed prior to execution in the Company's offices; the compensation provided by the expense allowance contract was to be in addition to that provided by the basic contract. Nothing apparently was ever said about the term of duration of the agency contract.
 
 
 15
 In compliance with the interdiction of Rule 52(a) that findings of fact shall not be set aside unless clearly erroneous, this court cannot on this record reverse the trial court's finding that:
 
 
 16
 "* * * the extension of the expense allowance agreement was not intended to become part and parcel of the basic contract of agency, or a modification thereof, nor was it intended to amend said basic contract from one terminable at will to one of fixed duration, i. e., to May 31, 1956."
 
 
 17
 Thus, in accordance with the general rule, where the agency contract fixes no date or time for its duration it may be terminated at any time at the election of either party, Foster v. Atlas Life Ins. Co., 154 Okl. 30, 6 P.2d 805; Standard Life Ins. Co. v. Carey, 282 Pa. 598, 128 A. 537; Lewis v. Minnesota Mut. Life Ins. Co., 240 Iowa 1249, 37 N.W.2d 316; Michigan Mut. Life Ins. Co. v. Thompson, 2 Cir., 266 F. 973. Although the law will sometimes imply that parties intend the terms of a contract to be "for a reasonable time" when one party makes substantial expenditures in reliance thereon[3] we need not here consider that potentiality if the trial court's findings of justifiable cause are supported by competent evidence. Even an agency for a term may be revoked without liability if the agent violates the terms of the contract or the duties owing to the relationship. 32 A.L.R. 227.
 
 
 18
 The arrangement between these two corporations began in an aura of felicity among the officers of the two companies. But beginning in May, 1951, the Insurance Commissioner of Wyoming began receiving complaints from disgruntled Sterling policyholders concerning the length of time which elapsed between the acceptance of premium and the issuance of the policy; misrepresentations in the sale of the policy and delays in refunding premiums or even answering policyholders' correspondence. Despite assurance by the Agency that the matters would be taken care of and erring personnel removed, the letters continued to flow into the Commissioner's office on the same matters.
 
 
 19
 Certainly, some of the violations which disturbed the Commissioner were attributable to the Company. The Company had sold direct health and accident policies and accepted premiums from persons who were no longer insurable under the policies because they were over the age limit. It is not clear in all instances whether the unreasonable delays in issuance of policies were due to an agent's rescality or the Company's laxity. The Agency, however, admitted the defalcations of at least one agent and the inefficiency of its office manager.
 
 
 20
 The Wyoming Insurance Commissioner ordered a hearing in the fall of 1952 to revoke the license of the Sterling Insurance Company on these charges and others including four charges against the general agent and two against sub-agents of appellant. Conferences between a Company representative and the Commissioner resulted in a promise by the Company to make good on the questioned policies and return premiums and to remove all representation by the Agency in Wyoming as a condition to continuation of its license in Wyoming.
 
 
 21
 It is needless to recite all the evidence which would give the Company concern over the wisdom of retaining the Agency as its representative in any of the states. Either through very bad judgment or conflicting loyalties, appellant appointed as sub-agents men whose history indicated questionable reliability. The Agency president apparently attempted rehabilitation of a step-brother who was an alcoholic and had a criminal record by employing him about the Company's business with disastrous results. He aided another person in securing a pardon who eventually, according to the testimony, "cost us over $40,000." An agent in Colorado accepted premiums and applications, failed to remit either to the Company and was finally jailed. Regardless of the fact that the Company was apprised of past criminal records of the appointed agents and regardless of the indemnity agreement between the Agency and Company, it was apparent that the continuation of the relationship was endangering both the public and the Company's business.
 
 
 22
 When the Montana Insurance Commissioner complained of the Agency's activities within his jurisdiction the Company withdrew the power of the Agency to appoint agents there. A delegation from the Agency traveled to Chicago to meet with Company officials to attempt to retain the Agency's powers. In that meeting, the Agency officers were concerned with the decline in business and an official of the Company explained that he felt it was due to the poor business practices of the Agency management.
 
 
 23
 It was apparently agreed that the Agency might continue with authority to solicit business in Colorado only under the management of an official appointed by the Company. However, before the Company was able to locate a qualified manager, it received notice of suit brought by the Agency for breach of contract due to the withdrawal of the states of Wyoming, Idaho and Montana and it then terminated the entire Agency contract.
 
 
 24
 The Agency resisted the introduction of the above-outlined evidence and cites its admission as error in the trial court. To the complaint urging breach of contract by the Company, the Company had entered merely a general denial. The Agency asserts, as it did below, that justification for termination was an affirmative defense and could not be shown despite the liberality of Rule 15(b) of the Rules of Civil Procedure, 28 U.S.C.A., and the allowance of amendment by the trial court.
 
 
 25
 The Company, on appeal, claims the benefit of the evidence thus received upon two issues. First, that it committed no breach of contract because it was justified in terminating the contract and second, that the Agency is not entitled to renewal premiums because it breached the contract.
 
 
 26
 Under the first claim, obviously no affirmative relief was sought and a mere denial of a breach was sufficient to bring into play the rule announced in the A.L.I. Restatement of the Law of Contracts, section 315:
 
 
 27
 "(1) Prevention or hindrance by a party to a contract of any occurrence or performance requisite under the contract for the creation or continuance of a right in favor of the other party, or the discharge of a duty by him, is a breach of contract, unless
 
 
 28
 "(a) the prevention or hindrance is caused or justified by the conduct of the other party, * * *"
 
 
 29
 "Illustrations:
 
 
 30
 "2. A contracts to employ B, and B contracts to serve during the ensuing year. During the employment B commits material breaches of duty. A thereupon refuses to allow him to work further. A's refusal to allow B to acquire by further work a right to the agreed compensation is not a breach of contract, though A did not know of the breaches of duty at the time of such refusal."
 
 
 31
 The second claim to the significance of the evidence of breaches of duty by the Agency is tantamount to a claim that the Company was relieved of performance of any of the duties created by the Contract by virtue of the wrongs of the Agency and could have brought action to collect damages itself. This indeed introduces an element foreign to the pleadings and is in the nature of an affirmative defense which, if available to the Company, should have been pleaded with particularity.
 
 
 32
 The Company elected to terminate the duties arising under the contract rather than to treat its own duty as discharged and enforce a right of action against the wrongdoer, probably because it recognized that its activities and lack of supervision had been responsible in part for the failure of the enterprise or because the necessity of revoking the Agency's authority outweighed in value its damages. The effect of such a course is stated in A.L.I. Restatement of Contracts, sec. 410:
 
 
 33
 "The duty to make compensation in unliquidated damages that rests upon a party to a bilateral contract, not yet fully performed on either side, who has committed such a breach thereof as to discharge the other party, is itself discharged by the manifested assent of the injured party to terminate all duties under the contract. But a debt that has arisen for performance rendered is not discharged by such assent."
 
 
 34
 Therefore, although the court was not in error in permitting evidence in justification of the termination, that evidence cannot be considered for the purpose of finding a breach on the part of the Agency which would deprive it of the right to rely upon the terms of its contract for compensation due for past performance.
 
 
 35
 The Company further contends that it should be relieved from the payment of renewal commissions after termination because of the failure of the Agency, after demand, to execute a general release as a condition precedent to the payment of such commissions as provided by the contract.[4] The contention is without merit. Insofar as the present action is concerned, to interpret the provision to require the Agency to dismiss with prejudice an action already commenced for breach under the contract would abrogate the basic rights of parties to a contract to receive in performance or alternatively in damages the bargain of the agreement. The Company's demand was excessive and should have been limited so as to eliminate claims then existing under the Agreement. And while ordinarily the demand of a party in excess of what he is entitled to receive under the contract will not justify the other party in refusing to perform that part of the condition to which the demandant is entitled, Colby v. Reed, 99 U.S. 560, 25 L.Ed. 484, the rule is not properly applicable here. Patently, the Company's chief concern in making its demand was the prevention of judgment against it for breaches of contract and not to protect its continuing business. It does not appear that it has been harmed by the failure of the Agency to render the required documents, but it does appear that it would not have made the payments even if they had been submitted.
 
 
 36
 The Company further contends in its cross appeal that the judgment award favoring the Agency in the sum of $1,607.24 is without support in the record. This sum represents charge backs made by the Company against commission credits given the Agency upon policies accepted by the Company but later rescrinded, either arbitrarily by the Company or for misrepresentation made by the policyholder. Although premiums were refunded to the policyholders, no claim is made that such action was necessitated through any fault of the Agency. Nor does the Company claim a specific contract right to make such charge backs but rather asserts that the Agency had acquiesced in the practice. The trial court, however, specifically found that the Agency had no intent to acquiesce, a finding not clearly erroneous under the evidence, and properly applied the general rule that an agent's earned commission cannot, absent an agreement, be lost to him through the unwarranted rescission of a contract of insurance or its cancelation by mutual consent but without fault upon the part of the agent. See Kortright v. Mutual Life Insurance Co. of N. Y., 123 Neb. 746, 243 N.W. 904 and cases cited therein.
 
 
 37
 By supplemental complaint, the Agency sought damages for the wrongful retention of commissions due it, claiming that this action by the Company caused the demise of its business. The Company first applied the money retained to repayment of bank loans, upon which it stood as surety for the Agency. The loans were paid by June, 1955, a year and a half after the Company had terminated the agency contract. Despite this fact, the trial court found that "the withholding of said moneys due and owing to plaintiff has deprived plaintiff of its only source of income and resulted in plaintiff's cessation of business." The rather subtle inconsistency of this statement comforts the Agency in its claim for damages beyond interest, but the trial court's failure to award such damages indicates its meaning in conformity with the evidence.
 
 
 38
 The Agency business was terminated upon the Company's revocation of authority in October, 1953, not by the subsequent withholding of money due. It is conceivable that the withholding of money might have had an adverse effect upon a going business which would be compensable in an action of this type, but since the only source of income remaining to the Agency was the money withheld, the trial court properly awarded interest as damages for the detention.
 
 
 39
 Other contentions made by both appellant and cross-appellant have been considered and are without merit.
 
 
 40
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The defendant-appellee and cross-appellant, Sterling Insurance Co., an Illinois corporation. Hereinafter, the Company
 
 
 [2]
 The plaintiff-appellant and cross-appellee, Sterling Colorado Agency, a Colorado corporation. Hereinafter, the Agency
 
 
 [3]
 See Allied Equipment Co., Inc. v. Weber Engineered Products, Inc., 4 Cir., 237 F.2d 879
 
 
 [4]
 "* * * In consideration of such renewal commissions as provided in this paragraph upon termination of this Agreement, the Agency agrees to release the Company of any and all obligations hereunder and further agrees to assign and transfer to the Company all of the Agency's rights arising in and out of this agreement, together with the good will in the business transacted hereunder."