**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 1 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LPG HOLDINGS, INC., a Virginia
corporation; MARTHA CHASE
McLAUGHLIN; CARROLL G.
MAYS,

     Plaintiffs-Appellants,

v.

CASINO AMERICA, INC., a
Delaware corporation,

     Defendant-Appellee.

No. 99-1037

(D.C. No. 98-M-1206)
(D. Colo.)

---

**ORDER AND JUDGMENT** [*]

---

Before **BRISCOE, HOLLOWAY,** and **POLITZ,** [**] Circuit Judges.

Plaintiffs LPG Holdings, Inc., Martha McLaughlin, and Carroll Mays

(collectively "LPG") appeal the dismissal of their claims against defendant Casino

America, Inc. ("Casino America"). The district court held that LPG's claims for

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Henry A. Politz, United States Court of Appeals for the
Fifth Circuit, sitting by designation.

breach of contract and breach of the implied covenant of good faith and fair dealing were foreclosed by the unambiguous language of the parties' agreement. Our jurisdiction arises under 28 U.S.C. § 1291. We affirm.

## I.

LPG alleges the following facts. On December 15, 1993, LPG acquired a parcel of real estate in Cripple Creek, Colorado from Thomas Hudson. In exchange for the property, LPG made "a substantial cash payment" and delivered "two promissory notes secured by first and second deeds of trust." Joint Appendix ("Jt. App.") at 9 (¶ 9). LPG acquired the property because it was interested in "providing a first class casino/hotel/parking complex" in Cripple Creek. Id. at 8 (¶ 9). [1] In the spring of 1994, LPG "began seeking a financially strong casino company to build and operate the casino complex." Id. at 9 (¶ 10). LPG met with Casino America and several other casino companies to discuss a potential deal. Casino America promised LPG that it would "conduct a serious feasibility study of the proposed casino complex," and that if the results of the study were positive it would compensate LPG and Thomas Hudson for the property in an amount "proportionate to the return Casino [America] would

---

[1] Because the property "was not large enough for a complete casino complex," LPG also entered into a purchase contract with Martha Hudson for an adjacent parcel. Jt. App. at 9 (¶ 9).

2

receive from its investment" in the complex.    Id. (¶ 11). [2]

On August 18, 1994, LPG and Casino America met in Denver and "reached certain understandings" in connection with the proposed complex.    Id. at 10 (¶¶ 13-14).  The parties agreed that Casino America "would build and operate the casino" if the results of its investigation were favorable, but would be free to "'walk away' at any time without making further payments" if the investigation produced unfavorable results.    Id. (¶ 14).  On August 24, Casino America sent LPG a memorandum stating that Casino America would pay certain amounts "upon completion of the construction of the casino and commencement of the operations therein."    Id. at 11 (¶ 15).  On August 26, Casino America entered into a letter agreement with Thomas Hudson and LPG.    Among other things, the letter agreement stated that: (1) Thomas Hudson had "commenced a foreclosure action" on the property, and the purpose of the letter agreement was to "set forth the terms of an extension" of an upcoming Public Trustee foreclosure sale scheduled for August 31, 1994; (2) Thomas Hudson would postpone any such sale if Casino America chose to make certain payments on behalf of LPG; (3) upon "closing" –

_____

[2] In July 1994, Casino America wired Martha Hudson $50,000 to "keep alive" the company's rights under the purchase contract for the adjacent parcel. Jt. App. at 10 (¶ 12).  LPG consequently informed other suitors that it had "reached an agreement" with Casino America "to allow it to investigate building and operating the casino complex," and that LPG would "reopen negotiations" only if Casino America "decided not to construct the casino complex."    Id.

3

defined as the execution of certain documents restructuring the two promissory notes – Casino America would "agree to construct a casino, restaurant and hotel upon the Property" and would "agree to start construction . . . and to proceed to completion in a diligent manner;" (4) if Casino America purchased the property or leased it from LPG, it was the intent of the parties that Casino America would be "personally obligated" to Thomas Hudson; and (5) the letter agreement represented the "entire agreement of the parties concerning the extension of the foreclosure sale," superseded "[a]ll negotiations and any prior agreements," and could not be modified "except by written agreement of the parties."     Id. at 28-32.

"During the remainder of 1994," Casino America made monthly payments to Thomas Hudson on LPG's behalf.     Id. at 12 (¶ 18).  At the same time, Casino America "continued to investigate the feasibility of the casino complex," negotiated with Cripple Creek officials, and "prepared projections of revenues, expenses, and profits."     Id.  From September through December of 1994, Casino America sent drafts of an agreement to LPG that were generally in accord with "the understandings reached at the Denver meeting."     Id. at 13 (¶ 19). Negotiations continued until January 1995, when Casino America requested a "hurry up" closing.     Id. (¶ 20).

On January 6, 1995, LPG and Casino America executed several documents. One document was an agreement through which LPG transferred the property to a

subsidiary owned by Casino America.     The agreement (dated January 5, 1995) contained the following provisions:

> 3. <u>Execution of Documents</u> . . . . The parties acknowledge that a letter among T. Hudson, Casino America and LPG has been executed outlining the terms under which T. Hudson is willing to extend the foreclosure sale of the Fee Property (the "T. Hudson Letter") and hereby consent thereto.
>
> 4. <u>Investigation</u> . Casino America agrees to proceed with the investigation of the Casino Property . . . to determine the feasibility of the construction of a casino, hotel and restaurant on the Casino Property and of a parking structure on [nearby property]. All determinations regarding feasibility shall be at the sole discretion of Casino America. . . . It is specifically understood that Casino America shall have no obligation to advance any amounts to T. Hudson or M. Hudson, . . . to obtain title to the Fee Property, . . . to enter into the Lease or otherwise proceed with the construction of a casino on the Casino Property.  All decisions relating to such matters shall be at the sole discretion of Casino America.  If Casino America shall decide, at any time prior to acquiring the Fee Property, not to proceed with the casino project on the Casino Property or does not make the payments outlined in the T. Hudson Letter, this Agreement may be terminated by LPG . . . or by Casino America. . . .
>
> 5. <u>Termination by Casino America</u> . Notwithstanding any contrary provision hereof, at any time prior to obtaining title to any portion, but not the entire Casino Property, Casino America shall have the right and option to terminate this Agreement. . . .
>
> 6. <u>Payments to Investors</u> . In exchange for the agreements of the Investors contained herein, Casino America hereby agrees to pay to the Investors [certain] amounts upon the earlier of either completion of the construction of a casino on the Casino Property . . . or commencement of gaming operating on the Property . . . .
>
> 8. <u>Conditions to Casino America's Obligations</u> . It is specifically understood and agreed that Casino America shall have no obligation to obtain title to any portion of the Property, to execute the Lease, to construct the Casino or to otherwise elect to proceed with the development of the Casino.  The decision to proceed with such development shall be at the sole option of Casino America. Casino America's obligation to pay any amount to any Investor

5

pursuant to the terms of this Agreement is conditioned upon Casino America's decision to obtain the Property. . . . [I]f Casino America elects not to construct or operate the casino/hotel/parking deck, any transferee of the Property shall be bound by this Agreement. . . .

14. Entire Agreement. This Agreement constitutes the entire contract between the parties as to the matters addressed herein and all prior negotiations, representations, understanding, or agreements pertaining to such matters are merged into and superseded by this Agreement.

Id. at 37-38, 41, 44. LPG, Casino America, and Thomas Hudson also executed documents restructuring the promissory notes and modifying the deeds of trust. These loan modification documents stated that (1) Casino America would "construct a casino, restaurant and hotel upon the Property," with an estimated completion date of November 1, 1995; and (2) the loan documents and the modifications represented the "entire agreement" between the parties, an agreement that superseded all prior understandings and could only be altered in writing. Id. at 51 (¶ 3A), 53 (¶ 9).

After the January 6 closing, events did not proceed as LPG had planned. Casino America concluded its investigation of the property, "represented to the City of Cripple Creek that it intended to build the casino complex," obtained "preliminary permits and approvals" for the complex, entered into a contract with a building company, and ordered steel for construction. Id. at 17 (¶ 33). Ultimately, however, Casino America did not build a casino. Casino America continued to exercise ownership rights and "receiv[ed] income" from the

6

property, but "paid nothing" to LPG.   Id. at 18 (¶ 35).  LPG alleged that if the casino complex had been built, LPG "would have received past and future payments totaling a present value in excess of twenty million dollars."   Id. at 18 (¶ 38).

LPG filed a diversity action against Casino America in May 1998.   LPG asserted claims against Casino America for breach of contract and breach of the implied covenant of good faith and fair dealing.   LPG alleged that the documents executed on January 6, 1995, in conjunction with the letter agreement, obligated Casino America "to construct [a] casino, hotel, and restaurant."   Id. at 18 (¶ 40).  LPG similarly alleged that Casino America "arbitrarily, and for reasons not associated with the viability of the casino complex, concluded that it did not wish to continue to construct the casino and stopped construction."   Id. at 20 (¶ 46).  Finally, LPG alleged that Casino America violated the agreement by failing to transfer certain shares of stock.   In July 1998, Casino America filed a motion to dismiss the complaint pursuant to Federal Rule of Procedure 12(b)(6).   LPG opposed the motion and filed a motion for partial summary judgment, asserting that the Letter Agreement, the January 5 agreement, and other documents unambiguously required Casino America to construct a casino complex.

In December 1998, the district court granted Casino America's motion to dismiss and denied LPG's motion for partial summary judgment.  The court began

by reciting paragraphs 6 and 8 of the agreement, which state that Casino America has "no obligation" to "construct the Casino or to otherwise elect to proceed with the development of the Casino." Id. at 106. The court rejected LPG's argument that language in paragraphs 4, 5, and 8 obligated Casino America to build a casino after acquiring the property, reasoning that these provisions related to Casino America's "power to terminate the contract." Id. at 107. The court then found that the merger clause in paragraph 14 foreclosed any suggestion that the agreement was a "multidocument contract including the Letter [A]greement and Loan Modification Documents." Id. The court further noted that the letter agreement contained a promise by Casino America to pay LPG a percentage of revenues from any casino complex constructed on the property, not a promise by Casino America to build such a complex. The court concluded by holding that LPG "lacked standing" to sue under the loan modification documents because (1) Casino America's obligations under the loan modification documents ran only to Thomas Hudson; and (2) LPG was neither a party to the loan modification documents nor a third party beneficiary. Id. at 108-09.

After the district court's ruling, LPG filed a motion to alter the judgment and to amend the complaint. LPG argued that the court "misconstrued and misapplied" the critical provisions of the agreement, unjustifiably ignored the provisions of the letter agreement and the loan modification documents, and

8

failed to address the implied covenant of good faith and fair dealing.     Id. at 112-13.  LPG also argued that it should be permitted to add a claim for fraud based on Casino America's purported misrepresentations.     On December 30, 1998, the district court issued a separate order stating that LPG's "motion to alter or amend judgment is denied and the motion for leave to amend is also denied in that the proposed amended complaint completely recasts this case and is therefore not a timely motion[.]"   Id. at 201.

## II.

### Casino America's Motion to Dismiss/LPG's Motion for Partial Summary Judgment

Although Casino America's motion was initially framed as a Rule 12(b)(6) motion to dismiss, the district court effectively converted it into a motion for summary judgment and considered matters outside the complaint.     See generally Whitesel v. Sengenberger  , 222 F.3d 861, 866 (10th Cir. 2000) (holding that district court may convert motion to dismiss into motion for summary judgment to consider matters outside the complaint).  We conclude this was proper.  By responding to Casino America's motion and filing its own motion for partial summary judgment, LPG was on notice that the district court might construe the letter agreement and the January 5 agreement and issue a summary judgment ruling.  See id.  Further, LPG clearly had an adequate opportunity to present to the court all materials relevant to such a ruling.     See id.

We review de novo the grant or denial of a motion for summary judgment. See Cooperman v. David, 214 F.3d 1162, 1164 (10th Cir. 2000). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Cooperman, 214 F.3d at 1164 (citation omitted).

### Alleged Breach of Contract

The parties agree that Colorado law governs our review of the contract. In Colorado "[t]he primary goal of contract interpretation is to determine and give effect to the intention of the parties." USI Properties East, Inc. v. Simpson, 938 P.2d 168, 173 (Colo. 1997); see also Pepcol Mfg. Co. v. Denver Union Corp., 687 P.2d 1319, 1313 (Colo. 1984) ("A fundamental rule of contract law is that the court should strive to ascertain and give effect to the mutual intent of the parties."). The intent of the parties to a contract "is to be determined primarily from the language of the instrument itself." USI Properties, 938 P.2d at 173. A court may "look beyond the four corners of the agreement in order to determine the meaning intended by the parties" only when the terms of the agreement are

10

ambiguous.  KN Energy, Inc. v. Great Western Sugar Co.  , 698 P.2d 769, 776 (Colo. 1985) .  "Courts possess no authority to rewrite contracts and must enforce unambiguous contracts in accordance with their terms."  Radiology Prof. Corp. v. Trinidad Area Health Ass'n  , 577 P.2d 748. 750 (Colo. 1978);  see also May v. United States , 756 P.2d 362, 369 (Colo. 1988) (reiterating that unambiguous contracts must be "enforced according to their plain language").

Colorado courts hold that a contract provision is ambiguous "when it is reasonably susceptible to more than one meaning."  Cheyenne Mountain Sch. Dist. #12 v. Thompson  , 861 P.2d 711, 715 (Colo. 1993)  .  To determine whether a contract is ambiguous, a court may consider "evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract.  However, the court may not consider the parties' own extrinsic expressions of intent."  Cheyenne , 861 P.2d at 715 (quoting KN Energy , 698 P.2d at 777);  see also Pepcol , 687 P.2d at 1314 (stating that "in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence").  In addition, "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all the provisions of the agreement."  May , 756 P.2d at 369 (quoting  Radiology , 577 P.2d at 750);  see also KN Energy , 698 P.2d at 777 (indicating that a court must attempt to "harmonize and give

11

effect to all provisions so that none will be rendered meaningless") (citation omitted). It is axiomatic that "[t]he mere fact that the parties differ on their interpretations of an instrument does not of itself create an ambiguity." Dorman v. Petrol Aspen, Inc., 914 P.2d 909, 912 (Colo. 1996) (citation omitted).

*Agreement and Letter Agreement*

There is much support for Casino America's argument that the January 5 agreement does not require it to construct a casino on the property. Paragraph 4 of the agreement provides that Casino America "shall have no obligation" to "enter into the Lease or to otherwise proceed with the construction of a casino on the Casino Property." Jt. App. at 38. Likewise, paragraph 8 of the agreement states that Casino America "shall have no obligation" to "construct the Casino or to otherwise elect to proceed with the development of the Casino." Id. at 41. Paragraph 8 goes on to say that "[t]he decision to proceed with such development shall be at the sole option of Casino America." Id. Where a contract is clear and unambiguous, courts must give effect to the plain and ordinary meaning of its terms. See Fox v. I-10, Ltd., 957 P.2d 1018, 1022 (Colo. 1998).

LPG argues the reference to the August 26 letter agreement in paragraph 3 of the January 5 agreement made it a part of that agreement. Paragraph 3 of the agreement states: "The parties acknowledge that a letter among T. Hudson,

12

Casino America and LPG has been executed outlining the terms under which T. Hudson is willing to extend the foreclosure sale of the Fee Property . . . and hereby consent thereto." Jt. App. at 38. Even if we were to conclude that the terms "acknowledge" and "consent" mean that the parties intended to incorporate some or all of the terms of the letter agreement into the agreement, the letter agreement does not aid LPG. As paragraph 3 of the January 5 agreement makes clear, the letter agreement "outlin[es] the terms" under which Thomas Hudson agreed to "extend the foreclosure sale" of the property.      Id.  Further, Casino America's agreement to construct a casino on the property is contained in one of the subparts of paragraph 2 of the letter agreement, which is entitled "Restructure." The opening paragraph states:

> If the fourth monthly payment of $20,000.00 is made, it would continue the Public Trustee sale until approximately January 11, 1995. If such fourth payment is made, Hudson agrees that prior to the expiration of the last continuance he will restructure the remaining balance due under the $370,000.00 Promissory note and the 1,200,000.00 Promissory Note. The term     *closing*  shall refer to the execution of the restructuring documents. Said restructure to be upon the following guidelines and other terms of this letter . . . .

Jt. App. at 29. The agreement to construct a casino on the property appears as one of the listed "terms" of restructuring. Thus, even though LPG and Casino America both signed the letter agreement, any obligations of Casino America to build a casino upon closing flowed to Thomas Hudson and not LPG.

LPG advances three additional arguments to show that a court could

13

reasonably conclude the agreement requires Casino America to construct a casino. First, LPG claims that several other provisions of the agreement eliminated Casino America's discretion once Casino America acquired the property. LPG highlights the seventh sentence in paragraph 4 (stating that the agreement can be terminated if Casino America decides not to proceed with the project "at any time prior to acquiring the Fee Property"), the first sentence in paragraph 5 (stating that Casino America has the right to terminate the agreement "at any time prior to obtaining title" to the property), and the third sentence in paragraph 8 (stating that "Casino America's obligation to pay any amount to any Investor" is "conditioned upon Casino America's decision to obtain the Property"). Id. at 38, 41. Second, LPG asserts that prior drafts of the agreement and a pre-agreement memorandum demonstrate that Casino America had the discretion not to construct a casino prior to – but not after – acquisition of the property. See, e.g., Appellant's Opening Brief at 37-38; see also id. at 36-37 (insisting that "by the time of 'closing' on January 6, 1995," the "provisions relating to Casino America's discretion regarding construction of the project had become obsolete"). Third, LPG maintains that Casino America's interpretation of the agreement is unreasonable because it "would yield the absurd conclusion that LPG intended to culminate this complex transaction by simply giving away its property to Casino America." Id. at 40. None of these arguments are persuasive.

14

Contrary to LPG's first argument, paragraphs 4, 5, and 8 of the agreement do not require Casino America to build a casino upon acquisition of the property. As the district court rightly recognized, the language highlighted by LPG in paragraphs 4 and 5 pertains to Casino America's "power to terminate the contract," not to Casino America's discretion to construct a casino. Jt. App. at 107. Indeed, if anything, these sentences demonstrate that the parties knew how to expressly link certain rights to Casino America's acquisition of the property. It follows that if the parties intended to link Casino America's property acquisition to its building of a casino, they would have done so expressly. Nor does the third sentence of paragraph 8 support an inference that Casino America is required to construct a casino because any ambiguity created by this sentence can be "resolved by reference to other contractual provisions." See Pepcol, 687 P.2d at 1314. The third sentence must be read in harmony with the remainder of paragraph 8, which explicitly contemplates that Casino America might "elec[t] not to construct or operate" a casino complex. Jt. App. at 41. The third sentence of paragraph 8 also must be read in harmony with paragraph 6, which expresses Casino America's agreement to pay certain amounts to investors either upon "completion of the construction of a casino" or upon "commencement of gaming operating on the Property." Id. at 39. Read in context, therefore, the third sentence of paragraph 8 provides only that Casino America's acquisition of the

15

property is a <u>necessary</u> condition for payments to investors, not that acquisition is a <u>sufficient</u> condition for such payments.

LPG's second argument – that prior drafts and memoranda support an inference that Casino America is required to build a casino complex – also misses the mark. As an initial matter, LPG forfeited its "prior drafts" argument for purposes of this appeal by failing to present it to the district court in a timely fashion. LPG does not deny that it did not submit prior drafts of the agreement in its motion for partial summary judgment, instead introducing them for the first time in its motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e) or 60(b). It is settled that "[a] Rule 59(e) motion cannot be used to present evidence that could and should have been presented prior to entry of final judgment." <u>Retired Chicago Police Ass'n v. City of Chicago</u>, 76 F.3d 856, 867 (7th Cir. 1996); <u>see also</u> <u>Global Network Technologies, Inc. v. Regional Airport Auth. of Louisville and Jefferson County</u>, 122 F.3d 661, 665-66 (8th Cir. 1997) (stating that a Rule 59(e) motion cannot be used to present "new evidence that could have been introduced during pendency of the summary judgment motion") (citation omitted). As a corollary, issues or evidence "presented for the first time" in a Rule 59(e) motion normally are "not preserved for appellate review." <u>Holland v. Big River Minerals Corp.</u>, 181 F.3d 597, 605 (4th Cir. 1999), <u>cert.</u> <u>denied</u>, 120 S. Ct. 936 (2000); <u>accord</u> <u>Thurman v. Yellow Freight Sys., Inc.</u>,

16

97 F.3d 833, 834 (6th Cir. 1996). In any event, prior drafts of the agreement obviously qualify as "extrinsic evidence," and are therefore inadmissible to vary the plain language of paragraph 4 and paragraph 8.

Equally unconvincing is LPG's third argument – that Casino America's interpretation of the agreement must be rejected out-of-hand as "unreasonable." It is true that "[a]n interpretation which makes [a] contract or agreement fair and reasonable will be preferred to one which leads to a harsh or unreasonable result." Grossman v. Sherman, 599 P.2d 909, 911 (Colo. 1979); accord Davis v. M.L.G. Corp., 712 P.2d 985, 990 (Colo. 1986). But even if we assume that under Casino America's interpretation LPG would receive minimal compensation for the property (an allegation that Casino America denies), that does not permit us to ignore the unambiguous language of paragraphs 4 and 8 or to restructure the agreement to make it more equitable. In the words of the Colorado Supreme Court,

> [t]he court's duty is to interpret and enforce contracts as written between the parties, not to rewrite or restructure them. The court will not interfere with the valid bargain of the parties: "The impossibility of courts attempting to act as business clearing houses for the readjustment of legitimate profits and losses occurring in the marts of trade and commerce is obvious at a glance. To attempt it . . . would be an unwarranted interference with the freedom of action of business men in their private affairs."

Fox, 957 P.2d at 1022 (quotation marks inserted and citation omitted); see also id. (explaining that parties to a contract "may agree on whatever terms they see fit so

17

long as such terms do not violate statutory prohibitions or public policy"). In short, LPG's purported failure to receive adequate compensation for the property does not mean that Casino America's interpretation of the agreement is invalid.

*Loan Modification Documents*

LPG also contends that it is either a party to or a third party beneficiary of the loan modification documents. Those documents unquestionably require Casino America to build a casino on the property. Under Colorado law, "[a] person not a party to an express contract may bring an action on such contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely an incidental benefit of the contract." E.B. Roberts Constr. Co. v. Concrete Contractors, Inc., 704 P.2d 859, 865 (Colo. 1985); see also Bayou Land Co. v. Talley, 924 P.2d 136, 153 n.26 (Colo. 1996) ("In order to be a third party beneficiary of a contract, the parties to the contract must intend to bestow a benefit on the third party."). "While the intent to benefit the non-party need not be expressly recited in the contract, the intent must be apparent from the terms of the agreement, the surrounding circumstances, or both." E.B. Roberts, 704 P.2d at 865.

Although LPG signed the loan modification documents on the same day that it executed the agreement, it did so simply "for the purpose of acknowledging

18

its consent and agreement to th[e] Modification." Jt. App. at 53 (¶ 5). LPG is not listed as a party in the loan modification documents. Further, the parties who executed the loan modification documents could have designated LPG as a third party beneficiary, but did not. The parties clearly knew how to make such a designation, because in the text of the loan modification documents they expressly identified Thomas Hudson as a third party beneficiary of the agreement. Finally, even if we assume arguendo that LPG is a third party beneficiary of the loan modification documents, Casino America is still entitled to prevail. Under the loan modification documents, the exclusive remedy for any failure to construct a casino is an acceleration of payments. Thus, even if LPG were a third party beneficiary of the loan modification documents and could "bring an action on such contract," see E.B. Roberts, 704 P.2d at 865, it could not obtain the remedies it seeks in this case (including damages for Casino America's alleged breach of the agreement).

Perhaps in recognition of these difficulties, LPG argues in its reply brief that its status as a third party beneficiary under the loan modification documents is immaterial. LPG maintains that even if it is not a third party beneficiary, the loan modification documents must be construed together with the agreement to

19

determine the parties' intent. [3] LPG emphasizes that the loan modification documents (1) were executed on January 6, 1995, the same day the parties executed the agreement; (2) were "an integral part" of the underlying transaction; and (3) "mak[e] it even more manifest that in closing the transaction the parties intended that Casino America would promptly proceed with the construction of the casino." Reply Brief at 18-19.

LPG's argument ultimately cannot prevail. Colorado law recognizes that

> [w]hen necessary to ascertain the agreement of the parties, separate instruments that pertain to the same transaction should be read together even though they do not expressly refer to each other, and even though they are not executed by the same parties. In this way each document can provide assistance in determining the meaning intended to be expressed by the others.

Town of Estes Park v. Northern Colorado Water Conservancy Dist., 677 P.2d 320, 327 (Colo. 1984) (citation omitted); see also Powder Horn Constructors, Inc. v.

---

[3] LPG also raised this argument in its opening brief, see Appellant's Opening Brief at 55, but relied solely on Sterling Colorado Agency, Inc. v. Sterling Ins. Co., 266 F.2d 472 (10th Cir. 1959). Sterling acknowledges that two instruments executed at the same time by the same parties relating to the same subject matter can be "taken in connection as forming together the several parts of one agreement." Id. at 476 (citation omitted). However, Sterling goes on to say that this principle "is merely a rule of construction to give effect to the intent of the parties. The provisions of one instrument are not thereby imported bodily into another. The application of the rule does not result in actual consolidation of the several contracts." Id. (citation omitted). Sterling further provides that "considering several instruments as one is not the natural construction, and is resorted to only to effectuate the intention. They may be intended to be separate instruments and to provide for different things." Id. (citation omitted).

City of Florence, 754 P.2d 356, 365 (Colo. 1988) ("Intent may be determined by reference to separate ancillary instruments."). The problem for LPG is that (1) the agreement specifically provides that Casino America has "no obligation" to build a casino on the property; and (2) the agreement expressly states that it is the "entire contract" with respect to the underlying transaction. Jt. App. at 38, 41, 44. Even if the agreement and the loan modification documents are "construed together," one cannot be used to rewrite the explicit language of the other. This is especially true given that the loan modification documents can be interpreted in a manner that makes them consistent with the agreement: In the former, Casino America ostensibly was willing to promise Thomas Hudson that it would build a casino because Thomas Hudson's remedies were limited to accelerated payments; in the latter, Casino America was not willing to extend the same promise to LPG (and in fact inserted language to the opposite effect) because no such limitation of remedies existed.

### Alleged Breach of Implied Covenant of Good Faith and Fair Dealing

In addition to claims for breach of contract, LPG's complaint contains a claim for breach of the implied covenant of good faith and fair dealing. "Colorado, like the majority of jurisdictions, recognizes that every contract contains an implied duty of good faith and fair dealing." Amoco Oil Co. v. Ervin,

21

908 P.2d 493, 498 (Colo. 1995); accord Occusafe, Inc. v. EG&G Rocky Flats, Inc., 54 F.3d 618, 624 (10th Cir. 1995) (applying Colorado law). This "good faith performance doctrine" is "generally used to effectuate the intentions of the parties or to honor their reasonable expectations." Amoco Oil, 908 P.2d at 498. Reliance on the implied covenant of good faith and fair dealing is justified when "the manner of performance under a specific contract term allows for discretion on the part of either party." Amoco Oil, 908 P.2d at 498; see also Bayou Land, 924 P.2d at 154 (commenting that courts find an implied duty "when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time").

A close examination of the agreement reveals that LPG's claim is insufficient as a matter of law. It is beyond cavil in Colorado that the implied covenant of good faith and fair dealing "will not contradict terms or conditions for which a party has bargained." Amoco Oil, 908 P.2d at 498; see also Soderlun v. Public Serv. Co. of Colorado, 944 P.2d 616, 623 (Colo. Ct. App. 1997) (noting that the covenant cannot be invoked to "inject new substantive terms into a contract or change its existing terms"); Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc., 872 P.2d 1359, 1363 (Colo. Ct. App. 1994) (explaining that the covenant "does not obligate a party to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express

22

provisions"). Here, paragraphs 4 and 8 of the agreement not only leave the development of a casino to Casino America's discretion, but also affirmatively state that Casino America has "no obligation" to proceed with such development. Jt. App. at 38, 41. To hold that Casino America has an implied obligation to build a casino under certain conditions would flatly contradict the language of these provisions. Such a holding would also lead to a curious result: Casino America would be subject to heightened obligations simply because the agreement states that certain matters are committed to the company's "sole discretion."

LPG also asserts that its "reasonable and justified expectations" were frustrated because Casino America (1) represented to LPG that it would conduct a feasibility study and build a casino if the results of the study were positive; (2) requested a "hurry up" closing and informed LPG that it intended to construct a casino; and (3) secured a construction contract, obtained permits, and obtained other construction materials after acquiring the property. The "reasonable expectations" protected by the covenant must derive from and be consistent with the terms of the underlying contract. See Amoco Oil, 908 P.2d at 498. The facts alleged by LPG satisfy neither of these criteria.

**LPG's Motion to Alter Judgment and Amend Complaint**

LPG's final argument is that the district court erroneously refused to grant

23

leave to amend the complaint. LPG contends that it "learned for the first time in Casino America's Motion papers" that on January 6, 1995 Casino America "had not yet made a decision to build the casino complex and needed to conduct further feasibility studies." Appellant's Opening Brief at 56. According to LPG, this directly contradicted Casino America's prior promises to construct a casino on the property. It follows, says LPG, that the district court should have permitted it to amend its complaint and add a claim for fraud. We review the denial of a motion for leave to amend for an abuse of discretion. See Scott v. Hern, 216 F.3d 897, 906 (10th Cir. 2000).

"[O]nce judgment is entered, the filing of an amended complaint is not permissible until judgment is set aside or vacated" pursuant to Federal Rule of Civil Procedure 59(e) or 60(b). Seymour v Thornton, 79 F.3d 980, 987 (10th Cir. 1996) (quoting Cooper v. Shumway, 780 F.2d 27, 29 (10th Cir. 1985)). LPG's appellate briefs do not mention Rules 59(e) or 60(b) or the specific standards a party must meet in order to set aside a judgment under those rules. "[A] party who refers to an issue in passing and fails to press it by supporting it with pertinent authority, or by showing why it is sound despite the lack of supporting authority, forfeits the point." In re Robinson, 987 F.2d 665, 668 (10th Cir. 1993) (citation and internal quotation marks omitted); see also Coleman v. B-G Maintenance Management of Colorado, Inc., 108 F.3d 1199, 1205 (10th Cir.

24

1997) ("Issues not raised in the opening brief are deemed abandoned or waived.").

By failing to adduce any authority showing that the district court misapplied Rules 59(e) and 60(b), LPG forfeited its right to challenge the denial of its motion for leave to amend.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

No. 99-1037, <u>LPG Holdings, Inc., et al. v. Casino America, Inc.</u>

HOLLOWAY, CIRCUIT JUDGE, CONCURRING AND DISSENTING:

Although I agree with the affirmance of the district court's refusal to grant LPG leave to amend its complaint, I am unable to agree that the district court did not err in dismissing LPG's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

Colorado law is clear that when construing a contract, a court may consider extrinsic evidence if the text of the contract in question is ambiguous. <u>KN Energy, Inc. v. Great Western Sugar Co.</u>, 698 P.2d 769, 776 (Colo. 1985) ("'[W]here the terms of an agreement are ambiguous . . . the court may look beyond the four corners of the agreement in order to determine the meaning intended by the parties.'") (quoting <u>Pepcol Manufacturing Co. v. Denver Union Corp.</u>, 687 P.2d 1310, 1314 (Colo.1984)). I believe that the January 5 Agreement between LPG and Casino America presents such an ambiguity. On the one hand, paragraph 8 states that Casino America was not obligated to construct a casino:

> <u>Conditions to Casino America's Obligations</u>. It is specifically understood and agreed that Casino America shall have no obligation to obtain title to any portion of the Property, to execute the Lease, to construct the Casino or to otherwise elect to proceed with the development of the Casino. The decision to proceed with such development shall be at the sole option of Casino America.

Appendix at 41.

On the other hand, the categorical nature of the above quoted paragraph 8 is contradicted by two other paragraphs of the Agreement, both of which indicate that Casino America's discretion to decide whether to construct the casino applied <u>only until it had</u>

acquired the property.  Paragraph 4 specifies that:

> If Casino America shall decide, at any time prior to acquiring the Fee Property, not to proceed with the casino project on the Casino Property or does not make the payments outlined in the T. Hudson Letter, this Agreement may be terminated by LPG or the Investors or by Casino America.  Casino America shall promptly notify LPG, Veterans and the Investors if Casino America decides not to proceed with the casino project.

Appendix at 38.

Paragraph 5 further buttresses paragraph 4's suggestion that Casino America's right not to build the casino was limited to the period before acquisition:

> Notwithstanding any contrary provision hereof, at any time prior to obtaining title to any portion, but not the entire Casino Property, Casino America shall have the right and option to terminate this Agreement.

Appendix at 38.

The Colorado Supreme Court has directed that in ascertaining "whether certain provisions of a contract are ambiguous," the contract language must be "construed in harmony with . . . all the parts and provisions of the agreement. . . ."  Cheyenne Mountain Sch. Dist. #12 v. Thompson, 861 P.2d 711, 715 (Colo. 1993) (quoting Christmas v. Cooley, 406 P.2d 333, 335 (Colo. 1965)); see also Northern Ins. Co. of New York v. Ekstrom, 784 P.2d 320, 323 (Colo.1989) (holding that a document is ambiguous "when it is reasonably susceptible to more than one meaning").  Given the inconsistency between paragraph 8's specification that Casino America had no obligation to construct the casino, and the suggestion in paragraphs 4 and 5 that Casino America could decide not to build the casino only before the purchase of the property, I am convinced that the January 5 Agreement is

-2-

"ambiguous." See Cheyenne Mountain, 861 P.2d at 715.

Faced with this ambiguity, the district court should have considered LPG's extrinsic evidence indicating that notwithstanding paragraph 8 of the January 5 Agreement, Casino America was obligated to construct the casino once it had purchased the property. The earlier August 26 Agreement, for instance, states that "[u]pon closing, Casino America will agree to construct a casino, restaurant and hotel upon the Property." Appendix at 29. Likewise, the Loan Modification Documents provide that Casino America "shall construct a casino, restaurant and hotel upon the Property. . . ." Appendix 51. I believe that these statements are of sufficient weight to permit LPG to survive a motion for summary judgment.

Nor do I believe that Casino America is helped by arguing that the January 5 Agreement is a complete integration. Although that agreement does contain a merger and integration clause, it also contains the provision that "[t]he parties acknowledge that a letter [the August 26 Agreement] among T. Hudson, Casino America, and LPG has been executed outlining the terms under which T. Hudson is willing to extend the foreclosure sale of the Fee Property . . . and hereby consent thereto." Appendix at 38 (emphasis added). This reference to the prior agreement and the stipulation that the parties "hereby consent thereto" suggests that the August 26 Agreement (and with it Casino America's obligation to build a casino) was incorporated into the January 5 Agreement. Since under Colorado law where "it is shown that a writing was not intended to be fully integrated, terms other than those set forth in the writing may be proved by parol evidence," the district court should have considered

-3-

those documents manifesting Casino America's obligation to construct the casino. <u>Harmon v. Waugh</u>, 414 P.2d 119, 121 (Colo. 1966) (quoting <u>Coulter v. Anderson</u>, 357 P.2d 76, 80 (Colo. 1960)).

I also cannot agree with the court that LPG's claim for breach of the implied covenant of good faith and fair dealing is insufficient as a matter of law. Under Colorado law, "[t]he good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations." <u>Amoco Oil Co. v. Ervin</u>, 908 P.2d 493, 498 (Colo. 1996). Although the court is correct that the covenant of good faith and fair dealing does not introduce obligations that contradict the terms of the contract, that is not the case here. As discussed above, there is considerable ambiguity as to whether Casino America's discretion to build a casino continued to apply after it purchased the property. Thus, the obligation that LPG seeks to enforce though the covenant of good faith and fair dealing -- that Casino America was required to satisfy LPG's reasonable expectation that it would build a casino -- may be read harmoniously with the express language of the contract.

Accordingly, I do not believe that Casino America was entitled to summary judgment and thus would reverse the district court's grant of that motion. Concerning LPG's claim that the district court erred in refusing to grant its motion for partial summary judgment, however, I would affirm the ruling below as I believe that the contract language is too ambiguous to warrant summary judgment for LPG. And as noted, I would affirm the denial of leave to amend LPG's complaint. Therefore, as explained above, I must respectfully concur in part

-4-

and dissent in part.